IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ALLIANCE FARM AND RANCH, LLC | § | Bankruptcy Case No. 25-30155 |
| and | § | |
| ALLIANCE ENERGY PARTNERS, LLC | § | |

### DUSTIN ETTER'S RESPONSE TO DEBORAH CRAIN'S MOTION FOR ALLOWANCE OF ATTORNEY'S FEES AND COSTS

Creditor and Interested Party Dustin Etter files this Response to Deborah Crain's Motion for Allowance of Attorney's Fees and Costs ... (Doc. 194). Mr. Etter is opposed to the Application. In short, the Application should be denied because:

(a) The requested fees are not for alleged services which provided significant benefit to the estate. Mr. Etter's notice of lis pendens—which Ms. Crain actually tried to expunge—rather than efforts on behalf of Mr. Furr, is what prevented a sale without a deal to pay money to the estate from happening. Ms. Crain is therefore, in significant part, trying to get paid for taking credit for what the undersigned counsel actually accomplished.

(b) Mr. Furr did not retain or use the services of Ms. Crain or her firm to benefit anyone but himself, and often at the expense of the Debtors, took hundreds of thousands of dollars out of the debtors less than 90 days before they filed for bankruptcy for "attorney's fees and severance," and should not get a massive windfall even if he accidentally, while trying to loot the Debtors, unintentionally provided a benefit in addition to all of the harm he caused.

(c) The amount of fees and hourly rates are grossly excessive for foreclosure defense and justice court eviction defense in Texas state courts.

(d) Several of the entries in question do not appear to be for things that even incidentally benefitted the estate at all but rather were intended to solely further the interests of Jerod Furr personally in either his the litigation Mr. Etter brought against Mr. Furr or in Mr. Furr's efforts to make off the Debtors' assets.

### I. BACKGROUND

1.      This bankruptcy and the various related lawsuits and legal proceedings ultimately arise out of Jerod Furr looting the otherwise-profitable business of non-debtor

**1** of **6**

AE Partners Holdings, Inc. ("AEPH") and its various subsidiaries, including Debtor Alliance Energy Partners, LLC ("AEP"), to support Mr. Furr's lavish lifestyle to the point that by mid-2024, the business had largely ceased to pay its creditors, was bleeding business, and ultimately failed. As a part of Mr. Furr's efforts to loot the business, Mr. Furr created Alliance Farm & Ranch, LLC ("AFR"), an entity wholly owned by him. Mr. Furr purchased a 73-acre ranchette in the name of Debtor AFR even though all of the funds for buying the property and trying to stave-off foreclosure ultimately came from Debtor AEP (at least $1,400,000), its non-debtor parent AEPH (at least $155,000), and its non-debtor affiliate Invictus Drilling Motors, LLC ("Invictus") (at least $426,800).

2. In July 2024, Mr. Etter—who is a 49% owner of AEPH—filed a lawsuit against Mr. Furr, Mr. Furr's alter ego Debtor AFR, and others individually and derivatively on behalf of AEPH and all of its various subsidiaries including Debtor AEP and non-debtor Invictus to try to stop Mr. Furr's misappropriation and mismanagement. In connection with that lawsuit, to prevent Mr. Furr from selling the 73-acre property and making off with the money, Mr. Etter filed a notice of lis pendens both individually and derivatively on behalf of entities including Debtor AEP.

3. In or around late November 2024, Mr. Furr transferred $100,000 from nondebtor AEPH to Debtor AFR to pay the seller of the 73-acre property a $100,000 fee for a short forbearance on foreclosure. But that failed to rescue the property resulting in it being lost in foreclosure on January 7, 2025. The AFR bankruptcy was filed on January 7, 2025, an hour or so after the foreclosure. Additionally, AFR filed a state court foreclosure injunction suit in January 2025, but AFR was never able to obtain an injunction stopping the foreclosure or any sale of the property.

4. From January 2025 through May 2025, the undersigned counsel had

repeated discussions with various persons, including counsel for the sellers who foreclosed on the 73-acre property. In those communications, counsel for the sellers who foreclosed complained that they could not sell the property without the notice of lis pendens released. The undersigned counsel repeatedly explained that the lis pendens would be released conditioned upon any funds not going to the sellers going into the registry of an appropriate court so that Mr. Furr could not abscond with the money.

5. In the interim, in the time between Mr. Furr's lawsuit was filed in July 2024 and the filing of the AEP bankruptcy in April 2025, Mr. Furr took hundreds of thousands of dollars out of the Debtors, including $300,000 out of Debtor AEP less than 90 days before its bankruptcy was filed allegedly for "attorney's fees and severance."

6. In May 2025, Mr. Furr attempted to terminate the bankruptcies in order to enable him to enter into a settlement agreement with the sellers of the 73-acre property which called for Mr. Furr personally, rather than either Debtor, to be paid $1,500,000 for settling claims related to the property. *See* Doc. 94. Ms. Crain appears to have been Mr. Furr's primary counsel in negotiating that settlement. Mr. Furr's attempt, with Ms. Crain's assistance, to personally pocket $1,500,000 that should have gone to one or both Debtors, led to Mr. Furr's prior counsel withdrawing and the Court ending Mr. Furr's debtor-in-possession control and appointing a trustee.

## II. DISCUSSION

7. The fees of Deborah Crain and her firm that Mr. Furr should not be paid out of either of the Debtors for a variety of reasons.

8. First and foremost, it appears that the objective of Ms. Crain's representation was to personally enrich Mr. Furr at the expense of Debtors AEP and AFR. If in failing to do so, Ms. Crain's services accidentally and incidentally benefited the

Debtors, Mr. Furr should no more be rewarded for that than a burglar who in trying to escape a house uses a fire extinguisher to put out an electrical fire in the way of the front door of the house.

9. Second, Ms. Crain's services did not provide the expansive benefits that she claims they did. Ms. Crain never had a hearing in the state court foreclosure injunction suit. The notice of lis pendens filed on behalf of Mr. Etter, not alleged work of Ms. Crain, is what prevented AFR's lender who had foreclosed on the property from selling it. Similarly, Ms. Crain did not negotiate a deal under which AFR would get anything. Rather, the settlement agreement that she negotiated called for Mr. Furr to personally pocket 100% of the $1,500,000 payment. After Mr. Furr was caught, he said he only actually intended to keep $500,000 for himself. Doc. 94-1. This seems like a poor after-the-fact justification for Mr. Furr's efforts, with Ms. Crain's assistance, at naked embezzlement and misappropriation. But in any event, even if Mr. Furr were taken at his word, it would still mean that Mr. Furr, with Ms. Crain's assistance, was trying to take at least $500,000 that should have immediately belonged to Debtor AFR or others besides Mr. Furr. Here again, it was the efforts of counsel retained by Mr. Etter together with counsel for the Creditor's Committee that ultimately caused the Furr-takes-all-the-money deal negotiated by Ms. Crain to be changed to a deal under which the $1,500,000 was changed to go to the Debtors.

10. The hourly rates, total fee, as well as various particular fee entries are also unreasonable. The $600/hour rate that Ms. Crain charged is simply not a reasonable hourly rate for standard foreclosure defense-type litigation—which is what Ms. Crain handled—in Texas state court including in Montgomery County, Texas. Ms. Crain also purported to charge $600/hour for apparent eviction defense in a JP court. Doc. 194-13,

pg. 3. Here again, $600/hour is not a reasonable hourly rate for representation for eviction defense in justice court. In either instance, a highly skilled and experienced attorney might warrant an hourly rate in the $400s. But $600/hour is simply well beyond what is a reasonable hourly rate in those contexts.

11. The alleged hours expended are also unreasonable and excessive. Hours and hours were allegedly spent on alleged research, factual investigation, and "processing." E.g., Doc. 194-13, pgs. 6-8.

12. Several of the entries for which Mr. Furr is seeking to recover attorney's fees are particularly troubling because they are for legal services used to try to abscond with the $1,500,000. Here are just a few examples. Ms. Crain has a $2,400 entry for 4/23/2025 for work on a motion to expunge lis pendens. Doc. 194-13, pgs. 9. That lis pendens was in place to stop Mr. Furr from taking the money and the undersigned counsel repeatedly told multiple people, including counsel for Mr. Furr, that the lis pendens would be released if any payment under the settlement was paid into the registry of the Court. Thus, the only purpose of attacking the lis pendens would be to enable Mr. Furr to personally take the full $1,500,000 free of any oversight by this Court. There is a $2,700 entry on 4/28/2025 for "Finalize Motion to Expunge and Settlement Agreement." Here again, the motion to expunge and the settlement agreement were both designed to enable Mr. Furr to abscond with $1,500,000 that is now held by the trustee.

13. Another particularly-troubling entry is a $2,400 entry for 7/17/2025 purportedly for among other things "Prepare response to Etter's stupid emergency motion." Doc. 194-13, pgs. 23. The "stupid" motion that Ms. Crain is referring to is a motion to get bank records which ultimately revealed that Jerod Furr took $300,000 out of Debtor AEP's main bank account—essentially emptying it—less than 90 days before AEP filed

for bankruptcy. Mr. Etter has information and belief that at least some of those funds have been used to pay Ms. Crain. So the motion that Ms. Crain refers to as "stupid" was actually a highly meritorious motion which led to the discovery of a $300,000 avoidable transfer to Mr. Furr which was likely used in part to pay Ms. Crain herself.

14. More generally, Mr. Furr's fee application seeks an award for alleged fees for services which were for personal advocacy for the benefit of Mr. Furr which was at best incidentally beneficial and at worst outright hostile to the Debtors.

## PRAYER

Creditor and Interested Party Dustin Etter requests and prays that Ms. Crain's application be denied and for such other and further relief to which Mr. Etter may be justly entitled.

Respectfully submitted,

IRELAN STEPHENS, PLLC

By: /s/ Noah Meek
Noah E. W. Meek
State Bar No. 24084554
Email: nmeek@irelanlaw.com
2520 Caroline St., 2nd Floor
Houston, Texas 77004
Phone: (713) 222-7666
Fax: (713) 222-7669

**ATTORNEYS FOR DUSTIN ETTER**

## CERTIFICATE OF SERVICE

This is to certify that on November 7, 2025, a true and correct copy of this instrument was served upon all parties **VIA the Court's CM/ECF System** in compliance with the Federal Rules of Bankruptcy Procedure.

/s/ Noah Meek
Noah Meek