**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ALLIANCE FARM AND RANCH, LLC | § | Bankruptcy Case No. 25-30155 |
| and | § | |
| ALLIANCE ENERGY PARTNERS, LLC | § | |

**DUSTIN ETTER'S RESPONSE TO
JEROD FURR'S MOTION TO CONVERT CASE TO CHAPTER 7**

Creditor and Interested Party Dustin Etter files this Response to Jerod Furr's Motion to Convert Case to Chapter 7. Doc. 266. Mr. Etter is opposed to the Motion. Since two prior settlements (that included Mr. Furr) failed, Mr. Furr has taken the approach of attempting to thwart the Debtors' Modified Plan[1] and try to cause the Chapter 11 Trustee's settlement with Mr. Etter to fail. The Court should reject Mr. Furr's attempt to derail the Debtors' Modified Plan and settlement with Mr. Etter by converting to Chapter 7, as this merely restarts the process to reach a resolution in this case. The Court should consider the Modified Plan at the April 16, 2026 confirmation hearing, and allow these protracted bankruptcy cases to resolve in an orderly and expeditious way that is satisfactory to everyone but the one person, Mr. Furr, whose actions and transfers precipitated these bankruptcies.

**I. BACKGROUND**

1.      By way of background, this bankruptcy and the various related lawsuits and legal proceedings ultimately arise out of Jerod Furr transferring assets to himself from the

---

[1] On October 2, 2025, the Trustee and Committee filed their *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Alliance Farm and Ranch and Alliance Energy Partners, LLC Proposed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors* (the "Plan"). (Doc. 187).  On March 4, 2026, the Trustee and Committee filed modifications to the Plan (the "Modified Plan"). (Doc. 255).

otherwise-profitable business of non-debtor AE Partners Holdings, Inc. ("AEPH") and its various subsidiaries, including Debtor Alliance Energy Partners, LLC ("AEP"), to support Mr. Furr's lavish lifestyle to the point that by mid-2024, the business had largely ceased to pay its creditors and ultimately failed. Mr. Furr created Alliance Farm & Ranch, LLC ("AFR"), an entity wholly owned by him, primarily to funnel money to himself from AEPH and its subsidiaries.

2.      On 1/7/2025, this case started as a Chapter 7 bankruptcy filed solely on behalf of Debtor AFR. Then, on 3/17/2025, Mr. Furr caused AFR to file a motion to convert to Chapter 11. Doc. 14. Mr. Etter opposed conversion to Chapter 11. Doc. 22. The Court granted the motion to convert to Chapter 11 (Doc. 24), which allowed Mr. Furr to stay in control and attempt to pocket the proceeds from the sale of AFR's ranchette which was paid for primarily by AEP.

3.      On 5/5/2025, Mr. Etter filed a motion to convert to Chapter 7 or alternatively to appoint a trustee after it became apparent that Mr. Furr was attempting to abscond with money belonging to the Debtors' estates. Doc. 68. On 5/22/2025, the Committee of Unsecured Creditors filed a motion to appoint a Chapter 11 trustee. Doc. 98. At the May 2025 hearing, the Court specifically considered whether a Chapter 7 trustee or a Chapter 11 trustee was more appropriate and ultimately decided to keep this case in Chapter 11. Doc. 112.

4.      This case then proceeded for many months in Chapter 11 without any complaint from Mr. Furr. In December 2025, Furr, Etter, the Trustee, and the Committee reached a comprehensive settlement mediated by Judge Isgur. Doc. 237-1. The comprehensive settlement called for this case to be resolved on the following main terms:

(a) The parties agreed that the bankruptcy would be handled through a Chapter

**2** of **8**

11 liquidation plan;

(b) The estates would keep all $1,500,000 in cash less payments to Furr and Etter;

(c) $168,000 net would be paid to Furr and Etter, with $93,000 to Etter and $75,000 to Furr;

(d) With respect to non-debtor affiliate AEPH's investment in non-debtor IsoDrill, Etter would receive 65% and Furr would receive 35%; and

(e) Etter would receive all other assets of the Debtors.

This deal ultimately collapsed.

5.      Following the collapse of the settlement, Furr refused proposals which would have reworked the settlement on essentially identical economic terms. Mr. Furr's shifting negotiating positions also made it apparent that Furr was not a reliable negotiating partner and that further efforts towards a global settlement would not be fruitful.

6.      With these developments, the failed mediated settlement with Judge Isgur, and Mr. Furr's unwillingness to settle on similar terms, Etter, the Trustee, and the Committee reached a very similar settlement (Doc. 242-1) that did not include Furr with the following terms:

(a) The parties agreed that the bankruptcy would be handled through a Chapter 11 liquidation plan;

(b) The estates would keep all $1,500,000 in cash less payments to Etter;

(c) $170,000 net would be paid to Etter; and

(d) Etter would receive all other assets of the Debtors.

Aside from not including Furr, the settlement without Furr is essentially identical to the settlement that included Furr. The difference in net payments made out of the estates is only $2,000.

## II. ARGUMENTS & AUTHORITIES

7.      Etter joins in the <u>Chapter 11 Trustee's Response in Opposition to Jerod Furr's Motion to Convert Case to Chapter 7</u> (Doc. 276).

8.      Furr's motion to convert is not about doing what is right for the Debtors or their creditors. Mr. Furr attempts to continue the proceedings with a Chapter 7 trustee,

arguably in hopes of trying to settle on more favorable terms than he has been able to reach with the Chapter 11 Trustee, the UCC, or Mr. Etter. Converting at this point would only delay final resolution here and greatly increase attorney's fees to the detriment of the Debtors' creditors.

9.      Mr. Etter therefore wants to emphasize to the Court the substance of what is going on here. In net economic terms for the Debtors, the current settlement without Furr (Doc. 242-1) is nearly identical (a mere $2,000 different) to the one that was with him (Doc. 237-1). Thus, Furr's complaints about the current settlement between the Debtors and Etter should not be considered as credible.

10.      Furr and Etter have substantially different relationships with the Debtors in ways that make it reasonable for the Trustee to consider a settlement with Etter alone very reasonable. Unlike Furr, Etter is not an insider or equity interest holder of Debtor AFR. Debtor AFR has no actual or potential claims against Etter who has never been paid anything by Debtor AFR. The roughly $1,500,000 in cash that the Trustee has is currently being held for Debtor AFR, and Etter has claims against Debtor AFR. Etter is also better positioned to assert claims against Debtor AEP. Etter received no payments within 90 days of the AEP bankruptcy, very small compensation for his work within 1 year of the AEP bankruptcy, and has significant claims for unpaid compensation. Thus, the Trustee could very reasonably conclude that Etter is a far stronger and more dangerous competitor to the funds and assets of the Debtors, particularly the cash assets of Debtor AFR, than Furr, and that settling with Etter provides substantial benefits to the Debtors. Even if the Trustee believes that the Trustee would ultimately prevail in litigation against Etter, the Trustee could reasonably conclude that a $170,000 net payment to Etter is reasonable in order to avoid the time, expense, and uncertainty of such litigation.

11.     The supposedly "valuable claims" against Etter that Furr references in Paragraph 23 of his motion to convert are anything but. The gist of most of the claims that Furr claims the Debtors have against Etter is the allegation that by allegedly accusing Furr of mismanaging the business in mid-2024, Etter caused the business to collapse. These claims are extraordinarily weak and would be expensive to litigate. The evidence before this Court including the testimony at the May 23, 2025 hearing demonstrate that Furr was mismanaging the business and pillaging the Debtors' bank accounts at the same time that Debtor AEP was unable to pay its core vendors. By the time the alleged defamatory statements about Furr were made in mid-2024, Debtor AEP had already been cut off from new services for months by its key vendor (and largest trade creditor) Gordon Technologies, per the 2025 deposition testimony of Gordon's then-president Christopher Koranek below:

108296_CHRISTOPHER KORANEK, (Pages 41:23 to 42:4)

41

Q.   Gordon's last job date with Alliance Energy Partners was in December of 2023; is that right?
     A.   Correct.

42

Q.   Why didn't Gordon continue to do business with Alliance Energy Partners after that?
     A.   We ended up having to pull our assets back because they weren't paying their bills.

It is also indisputable that Furr destroyed his own reputation with Debtor AEP's key vendor Gordon Technologies by bragging that he could get away with not paying Gordon, which Mr. Koranek regarded as "essentially admitting to embezzlement."

108296_CHRISTOPHER KORANEK, (Pages 47:12 to 48:5)

47

Q.   During that call or during that -- that meeting, according to Mr. Campbell, Jerod was essentially bragging about how he structured the entities to avoid paying vendors, including Gordon; is

that right?
A.   Yes.
Q.   Would you consider structuring -- or would you consider diverting payments to another entity to avoid payments to your creditors embezzlement?
A.   Say that again.
Q.   Would you consider diverting funds from Alliance Energy Partners to another entity to avoid paying -- paying Gordon and other creditors embezzlement?

48

A.   I would, yes.
Q.   So is it fair to say that you understood what Jerod told Marty was essentially admitting to committing embezzlement?
A.   Yes.

Proving damages for such a claim would also require proving lost profits, which would almost certainly require hiring an expert. "Further, lost profits must be based on net profits, not gross revenues." *TWC Aviation, Inc. v. World Tech. Aviation, LLC*, 714 S.W.3d 688, 701 (Tex. App.—Houston [1st Dist.] 2024, no pet.). Pursuing these claims would also put the Trustee in the untenable position of having to assert that Furr was a sound manager even though the Trustee was appointed in the first place because of Furr's mismanagement.

12.     Furr also wants the Trustee to pursue Etter for Etter's separate businesses under competition-related theories. The obvious problem with these claims is that those businesses were not set up or operating until after Etter was fired (informally on 8/3/2024 and then formally on 9/17/2024) and until after Debtor AEP had collapsed and effectively ceased to operate. A defunct business has no competitors. By the second half of 2024, Etter could hardly compete with Debtor AEP any more than he could compete with Enron or WorldCom. Furthermore, under Texas law, a "fiduciary relationship does not preclude the fiduciary from making preparations for a future competing business venture and [a]

fiduciary employee has no general duty to disclose his plans and may secretly join with other employees in the endeavor without violating any duty to the employer." *Shufood LLC v. Rong Liu*, No. 01-21-00463-CV, 2024 Tex. App. LEXIS 7727, at *43 (Tex. App.—Houston [1st Dist.] Oct. 31, 2024, no pet.). Thus, the competition-related claims that Furr wants the Trustee to pursue against Etter are nonviable upon cursory examination and would require significant expenses including a lost profits expert.

13.     None of the Debtors own the patent or equipment referenced in Furr's Motion. Absent an agreement and the consent of both Etter and Furr, the Debtors would have to pursue those assets through complicated and highly-contested litigation with no guarantee of success. It is therefore a reasonable exercise of business judgment for the Trustee to place a relatively low value on claims to those assets.

14.     Etter and the various trade creditors of the Debtors have been waiting for more than a year for this case to resolve with distributions of the $1.500,000 held by the Chapter 11 Trustee. Every interested party is satisfied with the Chapter 11 liquidation plan and the current settlement except for the one person, Furr, who is most responsible for the collapse and bankruptcy of the Debtors in the first place. Etter requests that the Court deny the motion to convert and any other requests by Furr to disrupt the proposed plan of reorganization.

### **PRAYER**

Creditor and Interested Party Dustin Etter requests and prays that Furr's motion to convert be denied and for such other and further relief to which Mr. Etter may be justly entitled.

Respectfully submitted,

IRELAN STEPHENS, PLLC

By:_____
 **/s/ Noah Meek**

      Noah E. W. Meek
      State Bar No. 24084554
      Email: nmeek@irelanlaw.com
      2520 Caroline St., 2nd Floor
      Houston, Texas 77004
      Phone:  (713) 222-7666
      Fax:    (713) 222-7669

**ATTORNEYS FOR DUSTIN ETTER**

## <u>CERTIFICATE OF SERVICE</u>

    This is to certify that on April 2, 2026, a true and correct copy of this instrument was served upon all parties **VIA the Court's CM/ECF System** in compliance with the Federal Rules of Bankruptcy Procedure.

       **/s/ Noah Meek**
    _____
    Noah Meek